IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:05CV239-MU

| | |
|---|---|
| SUNOCO, INC. (R&M), ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| vs. ) | ORDER |
| ) | |
| LSAA, INC. d/b/a SAM'S MART and ) | |
| SAN INVESTMENTS, INC., ) | |
| ) | |
|     Defendants. ) | |

This matter is before the court upon Plaintiff's Motion for Preliminary Injunction. A hearing was held on this motion on August 17, 2005. The following constitutes the court's findings and ruling on the motion based upon the briefs filed by the parties, oral argument, and the testimony of Jeffrey Byard, witness for the Plaintiff.

**BACKGROUND**

Plaintiff Sunoco, Inc. ("Sunoco") filed this lawsuit seeking a Declaratory Judgment as to its rights, duties and liabilities under a Distributor Agreement and Agreement of Sale with Defendant LSAA, Inc. ("Sam's Mart"). Sam's Mart has filed a counterclaim also seeking a Declaratory Judgment.

Sunoco is in the business of refining and marketing gasoline and other petroleum products. It markets its proprietary brand of Sunoco fuel to the motoring public through gas station/convenience stores owned by Sunoco, through dealer channels, and through branded distributor channels, that is, businesses like Sam's Mart with whom it contracts to sell its

1

branded motor fuel. Distributors are typically companies that own and operate their own chain of gas station/convenience stores. When a distributor contracts with Sunoco to sell its branded motor fuel, the distributor is responsible for picking up the fuel from a gasoline terminal[1] and transporting it with their own trucks or third-party trucking companies with whom they contract. Sunoco does not transport and deliver the petroleum products to the distributor stores.

Sunoco distributes its gasoline and other petroleum products to approximately 5,000 gas stations in 24 states. However, Sunoco has only been marketing its fuel in the Charlotte, North Carolina area since late 2003, when it purchased six Speedway stores. Sunoco then began looking for a distributor/partner to grow the Sunoco brand in the Charlotte area by adding more retail locations.[2] Sunoco's plan was to sell the six locations it purchased in Charlotte to a distributor and then entice the distributor to brand additional locations so that Sunoco could grow the brand in the Charlotte market.

Sunoco found the distributor/partner it was looking for in Defendant Sam's Mart. On October 27, 2003 Sunoco entered into a Distributor Branded Motor Fuel Agreement ("Distributor Agreement") with Sam's Mart. Sam's Mart owns and operates convenience store/gasoline stations in North and South Carolina. The Distributor Agreement gave Sam's Mart the right and obligation to purchase certain amounts of Sunoco branded motor fuel and to use Sunoco's trade

---

[1] The gasoline terminals are owned by third parties and distributors are authorized by Sunoco to pick up their Sunoco products at the terminal.

[2] Mr. Byard, Sunoco's division manager of distributors, testified in the hearing that when searching for a distributor/partner, Sonoco looks for distributors who are financially stable, present a good retail image to the public, offer good customer service, have clean facilities, and have the desire to grow the Sunoco brand and introduce it into new areas in the Charlotte marketplace.

name, dress and mark in the sale of the Sunoco product at its gas station/convenience stores. The term of the Distributor Agreement was for ten years, but allowed Sam's Mart to terminate the Agreement upon ninety days written notice, but only if Sunoco violates any "materially substantive provision" of the Distributor Agreement and does not promptly cure. (Distributor Agreement § 2.18(c)). Attached to the Distributor Agreement was a schedule which was supposed to list the locations of the Sam's Mart stores to which the Agreement was to apply; however, the schedule is blank. Mr. Jeffery Byard testified that the schedule was left blank because at the time the Distributor Agreement was signed, the list of locations had not been finalized.

In January of 2004, Sunoco and Sam's Mart entered into an Agreement of Sale whereby Sunoco sold to Sam's Mart its six Charlotte gas stations.[3] The Agreement of Sale allowed Sunoco the right to repurchase the stations if Sam's Mart terminated or failed to renew the Distributor Agreement. In addition to the six stores Sam's Mart purchased, another nine stores Sam's Mart either owned or supplied were imaged to the Sunoco brand, bringing the total number of Sam's Mart supplied Sunoco stations to 15. However, in December of 2004 Sam's Mart unilaterally changed its Sunoco branded station at Popular Tent Road to a Texaco branded station.

In March of 2005, Sam's Mart wrote Sunoco purporting to unilaterally terminate the Distributor Agreement due to Sunoco's alleged violations and material breaches of the Distributor Agreement. Sunoco was given no opportunity to correct or cure any alleged breaches

---

[3] Sam's Mart contends that it was fraudulently induced into entering into the Agreement of Sale by Sunoco's misrepresentations of the fuel volumes sold at the six stores.

as required by the Distributor Agreement.  In the letter, Sam's Mart complained that Sunoco breached several "substantive provisions of the Distributor Agreement," including Sunoco's failure to promptly re-image the stores at issue, "chronic, acute failures of Sunoco's credit and debit card equipment and electronic funds transfer system and equipment," and Sunoco's "repeated failure and inability to make available the necessary amounts of motor fuel required by the subject retail locations."

Sunoco denies materially breaching any terms of the Distributor Agreement.  Sunoco acknowledges that there were some delays in the imaging of some of the retail locations at issue and that one store had problems interfacing with Sunoco's EPOS/credit card system in July of 2004, but denies any material problems that were not promptly corrected.

On June 24, 2005, Sam's Mart gave notice of its intention to debrand each of the 14 gas stations from which it currently markets and sells Sunoco branded motor fuel, prompting Sunoco to file the instant motion.

**Preliminary Injunction Standard**

The standard for issuance of a preliminary injunction is the "balance of hardship" test stated in Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189 (4th Cir. 1977).  See also Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353 (4th Cir. 1991);  Telvest, Inc. v. Bradshaw, 618 F.2d 1029, 1032 (4th Cir. 1980). Before a preliminary injunction may be issued, the court must consider four factors: 1) the likelihood of irreparable harm to the Sunoco without the injunction; 2) the likelihood of harm to Sam's Mart if the injunction is issued; 3) Sunoco's likelihood of success on the merits; and 4) the public interest.  See Direx Israel, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802, 812 (4th Cir. 1991). If, after balancing the first two

factors, the balance "tips decidedly" in favor of the plaintiff, a preliminary injunction will be granted if "the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." Blackwelder, 550 F.2d at 195.

In other words, if the harm to the plaintiff greatly outweighs the harm to the defendant, then enough of a showing has been made to permit the issuance of an injunction. As the harm to the plaintiff decreases, when balanced against the harm to the defendant, the likelihood of success on the merits becomes important. Telvest, 618 F.2d at 1032-33. If the balance of harms does not "decidedly" or "significantly" favor the plaintiff, it must make a clear showing of likely success on the merits by presenting a "very clear and strong case." Direx Isreal, 952 F.2d at 813.

## DISCUSSION

As noted above, the court must first balance the harms to the Plaintiff and to the Defendant. Sam's Mart did not present any evidence at the hearing, and although Mr. Nafisi, the president of Defendant Sam's Mart, was present, he did not testify. Instead, Defendants relied upon Mr. Nafisi's Declaration, filed with Defendant's brief in opposition to the motion for preliminary injunction. In paragraph 16 of his Declaration, Mr. Nafisi makes a total of two sentences relating the harm Sam's Mart will allegedly suffer if the injunction is issued. Mr. Nafisi states that "[Sunoco's breaches] have made it impossible for Sam's Mart to operate stores under the Sunoco trade name in a competitive or profitable manner, and have harmed Sam's Mart's customer good will and business reputation with respect to all Sam's Mart stores in the Charlotte market. If Sam's Mart is required to continue operating stores under the Sunoco trade name, further harm will be caused to Sam's Mart's customer good will and business reputation

5

throughout the Charlotte market." (Nafisi Declaration, ¶ 16).

In contrast to Mr. Nafisi's summary and conclusory statements as to Sam's Mart's potential harm, Sunoco presented the testimony of Mr. Jeffery Byard, division manager of distributors for Sunoco, who testified rather extensively as to the irreparable harm Sunoco would suffer should Sam's Mart be allowed to debrand its remaining 14 Charlotte stations. The court found Mr. Byard's testimony to be highly credible. Byard explained that the debranding of the remaining 14 stores will inevitably cause Sunoco to lose customers and sales to a competitor, as the Sam's Mart stores are the only Sunoco stores in the Charlotte area.[4] Moreover, the reputation of Sunoco would be damaged in the marketplace because it will appear that Sunoco cannot maintain a relationship with a branded distributor. In addition, a certain number of Sunoco customers will be lost and will not return even after Sunoco repurchases the six stores it sold to Sam's due to the confusion generated by the debranding. As Sunoco is the official gasoline of NASCAR, not having an outlet in the Charlotte area, a hotbed of NASCAR racing, would also damage Sunoco's reputation in the eyes of perspective distributors, making it very difficult for Sunoco to find other qualified distributor/partners to market and sell its products in this area. Mr. Byard testified that he is not even aware of any other distributor candidates that would afford Sunoco an opportunity to market its fuel in this area. For example, it is likely that other stores in the Charlotte area are already committed to other brands. Thus, Sunoco's opportunities to market in the Charlotte area are very limited. All of this results in potential irreparable harm to Sunoco due to the loss of customer base, sales, and credit card loyalty.

---

[4] Mr. Byard testified that based upon Sam's Mart's actions at the Popular Tent store, he believed Sam's Mart would brand the remaining stores to Texaco, a competitor of Sunoco.

After considering the testimony of Mr. Byard and the Declaration of Mr. Nafisi, the court finds Mr. Byard's testimony to be more credible.[5] It appears to the court that the balance of harms in fact tips decidedly in favor of Sunoco. Accordingly, Sunoco must only raise serious issues as the merits of the case in order to meet its burden for a preliminary injunction. The court will thus examine the main issues the parties have raised with regard to the merits of this case.

First of all, it is undisputed that the March 25 letter from Sam's Mart purporting to terminate the Distributor Agreement did not provide any opportunity for Sunoco to "promptly cure" the alleged breaches Sam's Mart complains of. The Distributor Agreement clearly provides for such an opportunity to correct breaches.

Sam's Mart argues quite vigorously that it is not even contractually obligated to continue operating stores under the Sunoco trade name, and thus it is free to debrand the stations at will. The court finds such an argument to be without merit. The Distributor Agreement would be rendered virtually meaningless without such a requirement. It would be impossible for Sam's Mart to perform its part of the bargain to use its best efforts to actively promote, market and have available Sunoco branded motor fuel for sale, as well as to purchase the required fuel volumes if its stores were branded Texaco. The fact that the Distributor Agreement does not have a schedule of store locations listed at which the Sunoco products would be sold does not change the analysis, as the parties' course of dealing clearly established which stores the Agreement covered. As explained by Mr. Byard, the retail locations were not stated on the schedule at the

---

[5] When ruling upon a motion for preliminary injunction, the court may make credibility determinations with regard to the witnesses. See Fed. R. Civ. P. 52.

7

time the Distributor Agreement was signed because the list had not been finalized.

In his declaration, Mr. Nafisi outlines what Sam's Mart alleges to be material breaches of the Distributor Agreement by Sunoco. One of the items listed is Sunoco's "credit and debit card equipment and Sunoco's electronic funds transfer system and equipment have suffered chronic and acute failures." (Nafisi Declaration, ¶ 7(b)). Mr. Byard testified that only one location, the store on Popular Tent Road, experienced problems in July of 2004 with the credit and debit card equipment, and the problem was promptly diagnosed and corrected by Sunoco. Mr. Nafisi's Declaration also references Sunoco's alleged repeated failures to make available the necessary amounts of fuel required by Sam's Mart. Specifically, Mr. Nafisi states in paragraph 14 that "Sunoco has frequently run out of fuel, leaving the stores unable to fill our customers' needs. On May 31, 2005, Sunoco informed Sam's Mart that it would have no gasoline until June 4, 2005." Sunoco denies these allegations through the testimony of Mr. Byard, who stated that there were only two instances of supply disruptions in which the terminal ran out of inventory for a period of approximately four hours. Importantly, contrary to Mr. Nafisi's statement, motor fuel invoices demonstrate that Sam's Mart actually picked up approximately147,330 gallons of Sunoco fuel from the third-party terminal during the period of May 31, 2005 through June 4, 2005. Sam's Mart further alleges that Sunoco has failed to re-image its stores to the Sunoco brand. While Sunoco admits that there were some delays in re-imaging due to the bankruptcy of Color Art, Sunoco's vendor who produces Sunoco's proprietary graphics for re-imaging, Sunoco alleges that by June of 2004 all 15 stations were imaged in conformance with Sunoco's image specifications in the Distributor Agreement.

Based upon the briefs and the evidence presented at the hearing, the court finds that

Sunoco met its burden of raising serious issues as to the merits of this case. Indeed, it appears to the court at this early stage in the litigation that Sunoco has presented a very strong case for likelihood of success on the merits. Moreover, the court finds that there is a public interest in enforcing contractual obligations. Sam's Mart will suffer no harm in continuing to do what it contracted to do, and the court finds that the status quo ante litem should be maintained until the contract disputes between the parties can be resolved. Based upon the foregoing,

    IT IS THEREFORE ORDERED that Sunoco's Motion for Preliminary Injunction is hereby GRANTED, and Defendant is hereby enjoined from debranding and re-imaging its fourteen Sunoco branded stores pending the resolution of the declaratory judgment claims herein.

**Signed: August 26, 2005**

Graham C. Mullen
Chief United States District Judge